**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| **v.** | § | **MO:25-CR-00198-DC** |
| **EDDIE GLENN FRAZIER** | § | |

<u>**ORDER ON MOTION TO SUPPRESS**</u>

Before the Court is Defendant Eddie Glenn Frazier's Motion to Suppress (Doc. 53), which seeks suppression of statements made to officers of the Midland Police Department prior to receiving *Miranda* warnings. Having reviewed the Motion, the responses, the relevant case law, and the evidence, the Court **GRANTS IN PART** the Motion. Frazier's initial request for a suppression of all statements is **DENIED**. But his narrowed request for suppression of statements from approximately 8:24 p.m. to 8:26 p.m. (Doc. 58) is **GRANTED**.

## I.   BACKGROUND[1]

On October 7, 2025, at around 8:07 p.m., Midland Police Department officers were dispatched to a residence in response to a reported disturbance involving "Eddie Frazier," who was allegedly armed with a firearm and threatening to kill the complaining witness. Several minutes later, the first responding officer arrived. The scene was chaotic: multiple women were yelling that someone had a gun and was threatening to "kill everybody." A witness flagged the officer down and pointed toward two men near a truck.

---

[1] This background section stems from the body camera and vehicle footage provided to the Court at the hearing on the Motion.

Given the reported presence of a firearm, the first officer approached with his weapon drawn and instructed the two men to get on the ground and show their hands. The women continued shouting that one of the men had a gun. The suspect, later identified as Defendant Frazier, repeatedly denied having a weapon and stated that he had "just got off work." A second officer arrived shortly thereafter. The officers detained both men, informed them they were being detained pending investigation, conducted pat downs, handcuffed them, and placed them in separate marked patrol units.

Before being placed in the patrol vehicle, and shortly after being handcuffed, Frazier made unprompted remarks, including statements about having just gotten off work and initially running when he saw officers because he "didn't have time for this." An officer asked Frazier whether he had a weapon; Frazier responded that he did not and consented to a search of his person. No firearm was found.

A few minutes later, while Frazier was seated handcuffed in the rear of a locked patrol vehicle, the first officer returned and asked, "So what happened?" Frazier stated that he had returned from work and had been arguing with his girlfriend, who threatened to call the police and report that he had a gun. He again stated that he ran when he saw officers because he became nervous. The officer asked why multiple individuals were reporting that he had a firearm. Frazier responded that people knew him to have had one previously and referenced having "just got out of the FEDS program." The officer asked several additional times whether Frazier had a weapon, and Frazier continued to deny possessing one.

While this questioning was occurring, the first responding officer interviewed the complaining witness and continued searching the premises for the reported firearm. After

several minutes, a third officer arrived and advised Frazier of his *Miranda* rights. Frazier indicated that he understood his rights but continued speaking with officers.

In the minutes that followed, officers questioned Frazier about the reported firearm, including whether he had possessed or discarded it. They also asked follow-up questions about his belongings, employment, prior felony status or supervision, any affiliations, and the nature of the argument with the complaining witness. At one point, Frazier asked what offense he might face; an officer advised that he was detained but had not yet been formally charged.

While Frazier remained detained in the patrol vehicle, officers continued interviewing witnesses and searching the surrounding area. Approximately twenty minutes later, officers located and recovered a firearm outside on the premises.

After concluding the on-scene investigation, officers informed Frazier that he would be charged with aggravated assault with a deadly weapon and moved him to another patrol unit. He was then arrested and later formally indicted in this Court for violation of 18 U.S.C. § 922(g)(1). Frazier has previously been convicted of several qualifying felonies, including state charges for unlawful possession of a firearm by a convicted felon, unauthorized use of a motor vehicle, theft of a firearm, and possession of stolen firearms. Doc. 1 at 2-3.

He now argues that certain statements made prior to his arrest are inadmissible as they were made before he received *Miranda* warnings. Though he initially challenged all statements made to police during this encounter—claiming he was never Mirandized—Frazier later narrowed his suppression request to the initial questioning—when he was asked what happened and asked several times about the gun.

## II.   DISCUSSION

The Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, the Supreme Court held that to safeguard this privilege, law enforcement officers must advise a suspect of the right to remain silent, that any statement may be used against him, and that he has the right to the presence of retained or appointed counsel before conducting a "custodial interrogation." 384 U.S. 436, 444 (1966). Statements obtained in violation of *Miranda* are inadmissible in the Government's case-in-chief. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).

### A.  Custody

A suspect is "in custody" for *Miranda* purposes if he has been formally arrested or if, under the totality of the circumstances, "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc)) (alterations in original). This inquiry is objective and depends on the totality of the circumstances. *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011). The subjective views of the interrogating officers or the suspect are irrelevant. *Id.* The "reasonable person" is one who is neutral to the environment and the purposes of the investigation. *Bengivenga*, 845 F.2d at 596.

The restraint on freedom required for *Miranda* custody exceeds that required for a Fourth Amendment seizure; custody arises only when the restraint reaches the degree associated with formal arrest. *Id.* at 598. Moreover, the freedom-of-movement inquiry is necessary but not sufficient. Courts must also consider whether the circumstances present the inherently coercive pressures that animated *Miranda*. *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010); *Howes v. Fields*, 565 U.S. 499, 509 (2012).

In assessing custody, courts consider factors such as: (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory or non-accusatory nature of the questioning; (4) the degree of restraint on the suspect's freedom of movement; and (5) statements by officers regarding whether the suspect was free to leave. *Wright*, 777 F.3d at 774–75. Applying the factors, no single circumstance is dispositive, and the Court considers the totality of the circumstances. *Id.*

The first factor is the length of questioning. While the Fifth Circuit cautions against "'[o]verreliance upon the length of [questioning]' because doing so 'injects a measure of hindsight into the analysis which [it] wish[es] to avoid,'" *United States v. Coulter*, 41 F.4th 451, 458–59 (5th Cir. 2022) (quoting *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990)), it has also explained that fifteen or even thirty minutes "plainly does not suggest the equivalent of formal arrest." *Id.* at 458 (fifteen minutes from initial encounter to interview does not suggest custody); *United States v. Ortiz*, 781 F.3d 221, 233 (5th Cir. 2015) (emphasis added) (citation omitted) (a thirty-minute interview "suggests [that a suspect] was *not* in custody."). Here, roughly ten to fifteen minutes elapsed from the officer's initial contact with

Frazier to the relevant questioning. Under *Coulter* and *Ortiz*, that "comparatively brief" duration weighs against custody. 41 F.4th at 459; 781 F.3d at 233.

The location of the questioning, however, points the other way. The Fifth Circuit has frequently emphasized that "interrogations in public settings are less police dominated than stationhouse interrogations," in part because public scrutiny "reduces the hazard that officers will resort to overbearing means to elicit incriminating responses and diminishes the individual's fear of abuse for failure to cooperate." *United States v. Chavira*, 614 F.3d 127, 135 (5th Cir. 2010) (citing *Bengivenga*, 845 F.2d at 598). Thus, questioning roadside or even in an "unmarked police van in a public place" does not indicate custody. *Coulter*, 41 F.4th at 459; *Ortiz*, 781 F.3d at 231.

The setting of Frazier's questioning was materially more restricted and police-dominated than in *Coulter* and *Ortiz*. Frazier was questioned while handcuffed in the rear seat of a marked police vehicle—the place "where arrestees usually sit." *United States v. Gonzalez*, 814 F. App'x 838, 843 (5th Cir. 2020) (no custody in part because the suspect sat "in the front seat of the vehicle, not the back seat where arrestees usually sit"). And although the rear door was open during the questioning, the door had been locked while Frazier was inside, and it was opened only so the officer could speak with him—underscoring that access to and from the vehicle was controlled by the officer, not by Frazier. In context, the "open door" does not restore the kind of public, non-police-dominated atmosphere that typically weighs against custody. This factor weighs in favor of custody.

The third factor asks whether the officer's questions were accusatory in nature. That inquiry is distinct from whether the questioning was reasonably likely to elicit an

6

incriminating response for purposes of "interrogation." For example, in *Coulter*, the Fifth Circuit found that an officer's questioning about whether a suspect had any guns or anything illegal on him was not accusatory. 41 F.4th at 459. Here, the officer's initial "So what happened?" is likewise non-accusatory. But the follow-ups—*e.g.*, "Why are they saying you have a gun?" and "So you're telling me right now you did not have a firearm?"—are more pointed and skeptical, and they shift from open-ended inquiry toward confrontation. This factor therefore weighs slightly in favor of custody.

The fourth factor—the amount of restraint on Frazier's physical movement—is the most probative on these facts. The Fifth Circuit is clear that handcuffing, standing alone, does not automatically create custody. *Coulter*, 41 F.4th at 458; *Ortiz*, 781 F.3d at 230. And the Court accepts that officers may use handcuffing and other restraints for legitimate safety reasons during an investigatory detention. *See Coulter*, 41 F.4th at 460 (explaining that "objective concerns for officer safety" may justify handcuffing without converting the encounter into the functional equivalent of arrest); *United States v. Jin*, No. 4:21-CR-48-ALM-CAN-1, 2021 WL 6137594, at *4 (E.D. Tex. Dec. 2, 2021) (collecting cases to show that courts in the Fifth Circuit "have routinely recognized that questioning in a police vehicle does not render an interrogation custodial."), *report and recommendation adopted*, No. 4:21-CR-48, 2021 WL 6135774 (E.D. Tex. Dec. 29, 2021).

But the restraint here went beyond the measures addressed in other cases. In *Coulter*, the suspect "remained standing in the street" and was not "forced . . . into [the officer]'s vehicle." *Id.* at 460. And in *Ortiz*, although officers initially (and similarly) approached with guns drawn and handcuffed the suspect, the handcuffs were removed before questioning. *Id.*

7

(discussing *Ortiz*, 781 F.3d at 224–25, 232–33). And when he was questioned in the vehicle, he was not handcuffed. *Ortiz*, 781 F.3d at 225. So too in *Jin*. 2021 WL 6137594, at *4.

By contrast, Frazier was handcuffed and then placed in the back seat of a police vehicle for questioning—an environment that, as a practical matter, communicates a need for affirmative officer assistance to exit and depart. *Cf. United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012) (recognizing that the experience of being singled out and handcuffed can "color a reasonable person's perception" and create fear that restraints could be reapplied). Even acknowledging the safety justification, the combined restraints here are closer to the "degree associated with formal arrest." *Bengivenga*, 845 F.2d at 598. This factor therefore weighs strongly in favor of custody. *Cf. Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) (handcuffed and placed in the back of a patrol car was the kind of restraint typically associated with arrest).

The final factor concerns the officer's statements about Frazier's freedom to move or leave. For this factor, explicit assurances that a suspect is "not under arrest" and that he is "free to leave" weigh in favor of determining that a suspect is not in custody. *Wright*, 777 F.3d at 777. Similarly, informing a suspect he is "not under arrest, [even without] explicitly tell[ing] him he [is] free to leave[,] . . . would [also] suggest to a reasonable person that he [is] free to leave[.]" *Ortiz*, 781 F.3d at 231 (citation omitted). Here, the officer told Frazier he was being "detained," explained the safety rationale based on a reported gun, and suggested he would be released if nothing was found. Those statements weigh against custody—but only modestly—because they must be evaluated against what the scene communicated in practical terms: handcuffs, rear-seat placement, and officer control over the door.

8

On balance, the brevity of the encounter and the officer's "detention" explanation weigh against custody. But the location (rear seat of a marked unit) and, especially, the degree of physical restraint (handcuffs plus confinement in the back seat with the officer controlling exit) outweigh those considerations. The Court therefore finds that Frazier was in custody for *Miranda* purposes once he was placed in the back seat of the police vehicle and questioned there.

### B. Interrogation

"Interrogation" under *Miranda* includes both express questioning and its functional equivalent—that is, "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Here, the officer should have known that his questions about the gun and the events of that night were reasonably likely to elicit incriminating statements. Thus, the Court finds that Frazier was being interrogated while in the back of the police vehicle.

Accordingly, the Court **SUPPRESSES** only the unwarned statements obtained during the brief custodial questioning before *Miranda* warnings were administered—*i.e.*, the statements from 8:24 p.m. to 8:26 p.m.

## III. CONCLUSION

A reasonable person would not feel free to (and frankly could not) terminate an encounter and leave while handcuffed, seated in the back of a marked and previously locked police vehicle, and questioned by an officer in the way of his only exit. Those physical restraints make clear that he would need affirmative assistance to get out and go. The Court recognizes that Fifth Circuit precedent cautions against treating handcuffs or placement in a

9

patrol car, at least standing alone, as dispositive of custody. But here, those restraints operated in tandem, and the totality of the circumstances compels the conclusion that Frazier was in custody and subjected to interrogation. Thus, Frazier's pre-*Miranda* statements from approximately 8:24 p.m. to 8:26 p.m. are **SUPPRESSED**.

It is so **ORDERED**.

SIGNED this 17th day of March, 2026.

DAVID  COUNTS
UNITED STATES DISTRICT JUDGE

10